22-2101-bk(L), 23-965(L)
*In re Fairfield Sentry Ltd.*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

---

AUGUST TERM 2023
Nos. 22-2101-bk(L), 23-965(L)

**IN RE FAIRFIELD SENTRY LTD.,**
*Debtor.*[*]

---

On Appeal from the United States District Court
for the Southern District of New York

---

ARGUED: APRIL 12, 2024
DECIDED: AUGUST 5, 2025

---

Before:     NARDINI, MENASHI, and LEE, *Circuit Judges*.

The debtors in this bankruptcy case were investment funds based in the British Virgin Islands ("BVI") that invested in Bernard L. Madoff Investment Securities and were forced into liquidation in 2008. Liquidators were appointed for the funds in the BVI insolvency proceedings. In approximately 300 separate actions in the United

---

[*] The list of consolidated appeals may be found at Docket No. 22-2101, Order of November 23, 2022, Exhibit A, ECF No. 30; and at Docket No. 23-965, Order of August 3, 2023, Exhibit B, ECF No. 192, and Order of August 28, 2023, ECF No. 295. Parties that have withdrawn from the appeal by letter or stipulation are listed in Docket Nos. 22-2101 and 23-965.

States, the liquidators attempted to recover redemption payments made to investors in the funds shortly before the revelation of the Madoff Ponzi scheme. Those payments exceeded $6 billion. These actions were consolidated in the bankruptcy court after the liquidators obtained recognition of the BVI insolvency proceedings pursuant to Chapter 15 of the Bankruptcy Code. In a series of orders, the bankruptcy court dismissed most of the actions on the grounds that (1) it lacked personal jurisdiction over certain defendants, (2) the liquidators were bound by the Net Asset Value calculations that set the price at which the defendants redeemed their shares, and (3) the safe harbor for securities transactions under the Bankruptcy Code barred the liquidators' claims. The bankruptcy court sustained constructive trust claims against certain defendants that allegedly knew or had reason to know that the Net Asset Value calculations were inflated due to the Madoff fraud.

The district court affirmed the judgment of the bankruptcy court. On appeal, the liquidators seek restoration of the non-constructive-trust claims, and the defendants seek dismissal of the constructive trust claims. We hold that all of the liquidators' claims should have been dismissed pursuant to the safe harbor for securities transactions under § 546(e) of the Bankruptcy Code. We reverse in part and affirm in part the judgment of the district court.

———————

PAUL D. CLEMENT, Clement & Murphy, PLLC, Alexandria, Virgina (Matthew D. Rowen, Clement & Murphy, PLLC, Alexandria, Virgina; David J. Molton, Marek P. Krzyzowski, Brown Rudnick LLP, New York, New York; Caitlin J. Halligan, David Elsberg, Andrew R. Dunlap, Michael Duke, Max H. Siegel, Selendy Gay

2

Elsberg PLLC, New York, New York, *on the brief*), *for Plaintiffs-Appellants-Cross-Appellees*.

JEFFREY A. ROSENTHAL, Cleary Gottlieb Steen & Hamilton LLP, New York, New York (Carmine D. Boccuzzi, Jr., Cleary Gottlieb Steen & Hamilton LLP, New York, New York; Elsbeth Bennett, Nowell D. Bamberger, Cleary Gottlieb Steen & Hamilton LLP, Washington, DC, *on the brief*), *for Defendants-Appellees-Cross-Appellants*.

MENASHI, *Circuit Judge*:

The debtors in this bankruptcy case—Fairfield Sentry Limited ("Sentry"), Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda" and, together with Sentry and Sigma, the "Funds")—were investment funds based in the British Virgin Islands ("BVI") that invested heavily in Bernard L. Madoff Investment Securities ("BLMIS"). The Funds were forced into liquidation in the BVI after BLMIS was exposed as a Ponzi scheme in 2008. The plaintiffs-appellants-cross-appellees—Kenneth M. Krys and Greig Mitchell—are the liquidators appointed for the Funds in the BVI insolvency proceedings. The defendants-appellees-cross-appellants are investors and successors-in-interest of investors in the Funds who redeemed their shares for cash shortly before the collapse of the Ponzi scheme. The Funds are also plaintiffs-appellants-cross-appellees.

In approximately 300 separate actions in the United States, the liquidators attempted to recover the redemption payments made to the defendants, which exceeded $6 billion. These actions were consolidated in the bankruptcy court in the Southern District of New York after the liquidators obtained recognition of the BVI insolvency proceedings pursuant to Chapter 15 of the Bankruptcy Code. In a

3

series of orders, the bankruptcy court dismissed most of the actions on the grounds that (1) it lacked personal jurisdiction over certain defendants, (2) the liquidators were bound by the Net Asset Value calculations that set the price at which the defendants redeemed the shares, and (3) the safe harbor for securities transactions under the Bankruptcy Code barred the liquidators' claims. The bankruptcy court sustained constructive trust claims against certain defendants that allegedly knew or had reason to know that the Net Asset Value calculations were inflated due to the Madoff fraud.

The district court affirmed the judgment of the bankruptcy court. On appeal, the liquidators seek restoration of the non-constructive-trust claims, and the defendants seek dismissal of the constructive trust claims. We hold that all of the liquidators' claims should have been dismissed pursuant to the safe harbor for securities transactions under § 546(e) of the Bankruptcy Code. Accordingly, we reverse the judgment insofar as the district court allowed the constructive trust claims to proceed, and we otherwise affirm.

## BACKGROUND

Bernard L. Madoff ran the largest Ponzi scheme in history until the SEC exposed the scheme on December 11, 2008. Before then, the Funds raised capital from investors and gave it to BLMIS, supposedly to invest in securities. In fact:

> the money that [the Funds] transferred to BLMIS was not invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses. Further, none of the securities shown on statements provided to [the Funds] by BLMIS were in fact purchased for [the Funds]. Additionally, none of the amounts withdrawn by [the Funds] from its accounts with BLMIS were proceeds of

4

sales of securities or other investments. Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

App'x 4620. At the same time, the Funds unknowingly supported Madoff's scheme by attracting "new investors and new investments," which "allow[ed] Madoff to make payments to early investors who sought to liquidate their investments" and to "maintain[] the illusion that BLMIS was making active investments and engaging in a successful investment strategy." *Id.* at 4630-31. "Sentry was the largest of all the so-called 'feeder funds' to maintain accounts with BLMIS," while "Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry." *Id.* at 4630. "Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS." *Id.*

Investors purchased shares in the Funds by signing the Subscription Agreement, which was substantially identical for all three Funds. The Subscription Agreement bound the investors to the terms of the Funds' Articles of Association. The Subscription Agreement specified that it would be governed by New York law and that "any suit, action or proceeding … with respect to this Agreement and the Fund may be brought in New York." *Id.* at 1029.

Pursuant to the Articles of Association, an investor had the option to redeem its shares in the Fund at any time for cash. The redemption price of each share was to equal the current Net Asset Value per Share ("NAV"). The Articles provided that "[t]he Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue" and then applying

certain adjustments. *Id.* at 274. The Articles assigned ultimate responsibility for certifying the periodic calculations of the NAV to the directors of the Funds, but in practice the Funds delegated the task of calculating and certifying the NAV to the administrators of the Funds, primarily Citco Fund Services (Europe) B.V. ("Citco").

"In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry." *Id.* at 4631. These account statements, however, were "utterly fictitious." *Id.* at 4632. "[N]o securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements. … Indeed, no investments of any kind were ever made by BLMIS for Sentry." *Id.* Rather, the money in Sentry's account with BLMIS was used to perpetuate the Ponzi scheme. As a result, the NAVs that Citco and the Funds certified were artificially inflated. In fact, Sentry's account with BLMIS contained no assets. The liquidators allege that:

> [o]ver the course of fifteen years, in its capacity as service providers to the Funds, Citco reviewed information concerning BLMIS not available to the general public, and expressed internal alarm about what that information showed with respect to the likelihood of fraud at BLMIS, but turned a blind eye to the reality reflected in the information and instead proceed[ed] with issuing the Certificates as if there were no problem.

*Id.* at 4634. The Funds, however, "believed that the amounts provided in connection with [redemptions by investors] represented the

6

proceeds arising from the profitability" of investments in BLMIS. *Id.* at 4632.

After the exposure of the Ponzi scheme in 2008, "the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values," and "[i]n 2009, the Funds were put into liquidation proceedings in the BVI." *Id.* at 4647. The BVI court appointed the liquidators as representatives of the Funds' estates with responsibility for "all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates." *Id.* at 4648.

As the district court explained, "[w]hen a Ponzi scheme collapses, those who have already withdrawn some or all of their funds and recovered some or all of their investments are insulated from loss to a certain degree, while those whose money is still invested will suffer substantial loss, and sometimes receive nothing in return." *Fairfield Sentry Ltd. v. Citibank, N.A. London* (*Fairfield V*), 630 F. Supp. 3d 463, 475 n.11 (S.D.N.Y. 2022). For that reason, the liquidators initiated proceedings in the BVI against investors in the Funds—or transferees of such investors—that had redeemed shares before the collapse. The liquidators aimed to recover the redemption payments and "to distribute the recoveries equitably among members" of the Funds. *Id.* at 475. In support of that goal, the liquidators advanced the theory that the redemption payments "were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that [the redeeming investors] are not entitled to keep." App'x 4648.

The Commercial Division of the Eastern Caribbean High Court of Justice of the BVI, however, held that the investors had "paid good consideration for the Redemption Payments by surrendering their

7

shares with the Funds, and, consequently, the Liquidators were barred from recovering those payments." *Fairfield V*, 630 F. Supp. 3d at 476. The Eastern Caribbean Court of Appeal affirmed, and the case was then considered by the Privy Council in London. The Privy Council held that "the communications from Sentry to the Redeemers were 'certificates' within the meaning of Article 11, which meant that the NAV as determined by Citco was binding." *Id.* at 477 (citing *Fairfield Sentry Ltd (In Liquidation) v Migani* [2014] UKPC 9, 2014 WL 1219748 (PC)). The Privy Council "based its reasoning on the need for finality and certainty in securities transactions." *Id.* The Privy Council did not consider whether Citco acted in bad faith.

In addition to the BVI proceedings, the liquidators "filed about 300 actions in the United States to claw back over $6 billion" in allegedly inflated redemption payments. *Id.* at 478. While the defendants in the BVI and U.S. proceedings "partially overlapped," the parties in this case "agree that the claims asserted in the U.S. Proceedings are not the same as those asserted in the BVI Proceedings, as they involved different redemption transactions at different time periods." *Id.* at 478 n.22. In the U.S. proceedings, the liquidators asserted causes of action for "(1) unjust enrichment; (2) money had and received; (3) mistaken payment; (4) constructive trust …; (5) unfair preferences under BVI's Insolvent Act § 245; (6) undervalue transactions under the Insolvent Act § 246 (collectively, the 'BVI Avoidance Claims'); (7) breach of contract; and (8) breach of the implied covenant of good faith and fair dealing." *Id.* at 479.

In July 2010, the bankruptcy court in the Southern District of New York granted recognition of the BVI proceedings as a foreign main proceeding under Chapter 15 of the Bankruptcy Code, consolidated all the cases the liquidators had filed, and stayed the U.S.

proceedings pending resolution of the BVI proceedings. Under Chapter 15 of the Bankruptcy Code, if a company has entered insolvency proceedings in a foreign jurisdiction, a representative of its estate may file a petition for recognition of the foreign proceedings in U.S. bankruptcy court. *See* 11 U.S.C. §§ 1504, 1515. Upon the filing of a petition for recognition, the bankruptcy court determines whether to recognize the foreign proceeding as either a "foreign main proceeding," if it is "pending in the country where the debtor has the center of its main interests," or a "foreign nonmain proceeding," if it is pending in the country where the debtor merely "has an establishment." *Id.* § 1517. Recognition as a foreign main proceeding triggers certain automatic protections, including application of the automatic stay within the United States. *Id.* § 1520. Once recognition is granted, the bankruptcy court "may provide additional assistance to a foreign representative under [the Bankruptcy Code] or under other laws of the United States." *Id.* § 1507. In particular, "[u]pon recognition of a foreign proceeding," the bankruptcy court may "grant[] any … relief that may be available to a trustee," with certain exceptions, including relief pursuant to the statutory avoidance powers granted to the trustee by the Bankruptcy Code. *Id.* § 1521(a)(7).

The bankruptcy court lifted the stay after the Privy Council issued the *Migani* decision in 2014, and the liquidators moved for leave to amend the complaint to add allegations of bad faith on the part of Citco. The defendants moved to dismiss the liquidators' claims on the grounds of lack of personal jurisdiction, failure to state a claim, and the safe harbor for securities transactions of § 546(e) of the Bankruptcy Code. That section provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer

9

that is … [a] settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a … financial institution … in connection with a securities contract, as defined in section 741(7), … except under section 548(a)(1)(A) of this title.

*Id.* § 546(e). Section 561(d), meanwhile, provides that:

[a]ny provisions of this title relating to securities contracts … shall apply in a case under Chapter 15, so that enforcement of contractual provisions of such contracts and agreements in accordance with their terms will not be stayed or otherwise limited by operation of any provision of this title or by order of a court in any case under this title, and to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11 of this title (such enforcement not to be limited based on the presence or absence of assets of the debtor in the United States).

*Id.* § 561(d).

The bankruptcy court resolved the motions in a series of orders issued between 2018 and 2020. First, the bankruptcy court decided that the forum selection clause in the Subscription Agreements did not suffice to establish personal jurisdiction over 206 foreign defendants who had moved to dismiss for lack of personal jurisdiction. *In re Fairfield Sentry Ltd.* (*Fairfield I*), No. 10-13164, 2018 WL 3756343, at *8-14 (Bankr. S.D.N.Y. Aug. 6, 2018). Second, the bankruptcy court dismissed all the claims in the complaint except for the BVI Avoidance Claims and the constructive trust claims against the defendants alleged to have known the NAV calculations were inflated. *In re Fairfield Sentry Ltd.* (*Fairfield II*), 596 B.R. 275, 282 (Bankr. S.D.N.Y. 2018). In *Fairfield II*, the bankruptcy court held that (1) *Migani* did not preclude the liquidators' claims under the preclusion rules of

either the United States or the BVI; (2) the NAVs stated in the certificates were binding on the Funds—and therefore on the liquidators—regardless of Citco's bad faith, except with respect to the defendants who allegedly knew the NAVs were inflated; (3) the doctrine of *ex turpi causa non oritur actio* did not bar the liquidators' claims; (4) neither the Subscription Agreement nor the Articles required investors to return payments based on inflated NAVs; (5) the redemption payments were settlement payments made in connection with securities contracts and therefore qualified as covered transactions under the safe harbor for securities transactions of § 546(e); and (6) § 546(e) applied extraterritorially in Chapter 15 by virtue of § 561(d). *See id.* at 290-315.

The bankruptcy court declined to decide in *Fairfield II* whether—despite the transactions being covered—the safe harbor barred the liquidators' claims. *See id.* at 314-15 ("[T]he redemptions at issue were Covered Transactions because they were settlement payments made in connection with securities contracts. The more difficult question is whether the transferor or the transferee was a covered entity—either a financial institution or a financial participant.") (citation omitted). After receiving additional argument on that question, the bankruptcy court decided that the safe harbor barred the liquidators' claims that were based on BVI statutory law. *See In re Fairfield Sentry Ltd.* (*Fairfield III*), No. 10-13164, 2020 WL 7345988, at *7 (Bankr. S.D.N.Y. Dec. 14, 2020). The bankruptcy court decided that the constructive trust claims were not barred, however, because those claims were based on BVI common law. *See id.* at *8. The bankruptcy court reasoned that § 546(e) did not apply directly to the constructive trust claims and did not impliedly preempt those claims because "[c]ourts do not assume that otherwise applicable

11

foreign law is preempted absent express statutory language to that effect." *Id.* at *10.

The bankruptcy court denied the defendants' motion for reconsideration of its decision that the safe harbor did not bar the constructive trust claims. *In re Fairfield Sentry Ltd.* (*Fairfield IV*), No. 10-13164, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021). The U.S. District Court for the Southern District of New York affirmed the judgment of the bankruptcy court that dismissed all claims except the constructive trust claims. *See Fairfield V*, 630 F. Supp. 3d at 473.

Before this court are two appeals from the judgment of the district court in *Fairfield V*. In the appeal docketed at No. 22-2101, the liquidators argue that the district court should have reversed the bankruptcy court's dismissal of all the non-constructive-trust claims. In the appeal docketed at No. 23-965, the defendants against which the constructive trust claims were asserted argue that the district court should have reversed the bankruptcy court's decision that the constructive trust claims could be maintained despite the safe harbor for securities transactions.

## DISCUSSION

These appeals require us to answer two questions. The first question is whether the forum selection clause in the Subscription Agreements establishes personal jurisdiction over the defendants. We conclude that it does. The second question is whether the safe harbor of 11 U.S.C. § 546(e) bars the liquidators' actions. We conclude that the safe harbor applies extraterritorially and bars the actions. Because that conclusion resolves the case, we need not resolve the other disagreements between the parties.

12

# I

"Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006). The Subscription Agreements for the Funds contain a forum selection clause, which provides as follows:

> Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum. … Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

App'x 1029. Despite the forum selection clause, the district court held that it lacked personal jurisdiction over 206 of the defendants. The district court "agree[d] with the Bankruptcy Court's determination that the word 'and' should be read conjunctively, and that the claims here are not 'with respect to' the Subscription Agreement." *Fairfield V*, 630 F. Supp. 3d at 482-83. For that reason, the district court held that "the forum selection clause cannot establish the Bankruptcy Court's personal jurisdiction over the relevant Defendants-Appellees." *Id.* at 486.

13

## A

"We review district court decisions on personal jurisdiction for clear error on factual holdings and *de novo* on legal conclusions." *D.H. Blair*, 462 F.3d at 103 (quoting *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 36 (2d Cir. 2001)).

We have recognized that "[c]ourts applying New York law to contracts using the word 'and' look to the context in which the word is used to determine whether it should be read in the conjunctive or disjunctive sense." *Spanski Enters., Inc. v. Telewizja Polska S.A.*, 832 F. App'x 723, 725 (2d Cir. 2020). That context includes whether the parties used language other than "and" elsewhere in the contract to convey a disjunctive meaning. *See, e.g., id.* ("[R]eading the Agreement as a whole suggests that, when the parties sought to provide for unilateral rights, they used the term 'each party' to distinguish from the conjunctive 'TVP and SEI.'").

As the district court correctly observed, "in other parts of the Subscription Agreement, the parties repeatedly use 'or' or 'and/or' to show disjunctive meaning." *Fairfield V*, 630 F. Supp. 3d at 484.[1] Yet the liquidators do not argue that the word "and" must be read disjunctively. The liquidators concede, for example, that "if a bank invested in one of the Funds through a Subscription Agreement and separately provided banking services to the Fund, any dispute over

---

[1] *See, e.g.*, App'x 1027 ("Subscriber has obtained sufficient information from the Fund or its authorized representatives to evaluate such risks."); *id.* ("The Subscriber irrevocably authorizes the Fund and/or the Administrator to disclose, at any time, any information held by the Fund or the Administrator in relation to the Subscriber or his investment in the Fund to the Investment Manager or any affiliate of the Investment Manager or the Administrator.").

14

the banking services would be 'with respect to the Fund,' but not with respect to the Subscription Agreements" and therefore would not be covered by the forum selection clause. Appellants' Br., No. 22-2101, at 50. Accordingly, we accept that the word "and" should be read conjunctively. Under that reading, the forum selection clause covers the liquidators' actions only if those actions are "with respect to" the Subscription Agreements.[2]

The liquidators argue that the district court erred not in reading "and" conjunctively but in concluding that the proceedings here are not "with respect to this [Subscription] Agreement." We agree.

We have explained that the phrase "with respect to" is "synonymous" with phrases such as "related to," "in connection with," and "associated with." *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2001). These phrases are "not necessarily tied to the concept of a causal connection" and are "broader in scope" than "the term 'arising out of.'" *Id.*; *see also ACE Cap. Re Overseas Ltd.*

---

[2] As the district court recognized, "because the Subscription Agreement regulates the investment relationship between the members and the Funds, any dispute over the Subscription Agreement is necessarily also 'with respect to the fund.'" *Fairfield V*, 630 F. Supp. 3d at 484. For that reason, a conjunctive reading renders "and the Fund" superfluous because the forum selection clause would have the same scope if it applied to proceedings only "with respect to this Agreement." App'x 1029. As a general rule, "[a]n interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless … is not preferred and will be avoided if possible.'" *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quoting *Shaw Grp., Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 124 (2d Cir. 2003)). Such avoidance is not possible here, however, because a disjunctive reading would render "with respect to this Agreement" superfluous. Under that reading, the forum selection clause would have the same scope if it applied to proceedings only "with respect to the Fund."

*v. Cent. United Life Ins. Co.*, 307 F.3d 24, 32 (2d Cir. 2002) (describing the phrase "relating to" as "expansive"). "Related" means "connected by reason of an established or discoverable relation." *Coregis*, 241 F.3d at 128 (quoting Webster's Third New International Dictionary 1916 (1986)); *see also Related*, Black's Law Dictionary (12th ed. 2024) ("Connected in some way; having relationship to or with something else."); *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) ("The phrase 'related to' … embraces state laws 'having a connection with or reference to' [the specified subject matter] whether directly or indirectly.") (quoting *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008)).

The liquidators' actions have an "established or discoverable relation" to the Subscription Agreements. *Coregis*, 241 F.3d at 128. The liquidators seek "to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008," when the Ponzi scheme was revealed. App'x 4618. The liquidators allege that these payments "did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents." *Id.* at 4621. The lawsuits arise out of the relationship between the defendants as investors and the Funds as issuers of securities, and that relationship came into being through the Subscription Agreements. As the liquidators note, "the Subscription Agreements are the only documents that Defendants executed, and the only documents that bound Defendants to the Funds' Articles of Association, which established the mechanics for processing Fund redemptions." Appellants' Br., No. 22-2101, at 47. While the Subscription Agreements did not expressly incorporate the terms of the Articles of Association, *see Fairfield V*, 630 F. Supp. 3d at 486, those agreements informed investors that the Articles governed their relationship to the Funds. Because of this "discoverable relation"

16

between the liquidators' actions and the Subscription Agreements, the actions are "with respect to" the Agreements. *Coregis*, 241 F.3d at 128-29.

**B**

The defendants respond that this argument endorses a "but-for" test that we have rejected in cases involving arbitration clauses. *See* Appellees' Br., No. 22-2101, at 77 (citing *Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693 (2d Cir. 1965); *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173 (2d Cir. 2021)). The Subscription Agreements represent a but-for cause of the liquidators' actions precisely because those agreements created the investment relationships between the defendants and the Funds. *See Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) (explaining that "but-for" causation "is established whenever a particular outcome would not have happened 'but for' the purported cause").

It is not clear that we have rejected a but-for test for forum selection clauses. We require only a "discoverable relation" between the dispute and the agreement, *Coregis*, 241 F.3d at 128, and but-for causation might qualify as a "discoverable relation." Two other circuit courts have relied on our decision in *Coregis* to hold that but-for causation does qualify as a sufficient relationship between the dispute and the agreement. *See Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 220 (3d Cir. 2015); *Huffington v. T.C. Grp., LLC*, 637 F.3d 18, 22 (1st Cir. 2011). In fact, the insurer-defendant in *Coregis* prevailed on its argument that the lawsuits for which the insured sought coverage were "related to" insolvency because "the Lawsuits would not have been brought *but for* the insolvency of the Companies, and … consequently the Lawsuits arise out of, are based upon, or are related to the insolvency." *Coregis*, 241 F.3d at 126 (emphasis added).

17

Our own precedent therefore suggests that a lawsuit is "related to" its but-for cause.

However that may be, the liquidators disclaim reliance on a but-for test here. *See* Reply Br., No. 22-2101, at 6-7. Our precedents hold that a controversy may "relat[e] to" a contract for purposes of a dispute-resolution clause when the controversy arose out of a subsequent agreement between the parties and the "relationship" between the contract and the subsequent agreement was "clear and direct." *Pervel Indus., Inc. v. T M Wallcovering, Inc.*, 871 F.2d 7, 8-9 (2d Cir. 1989). In this case, there was a "clear and direct" relationship between the Subscription Agreements and the Articles of Association from which the liquidators' claims arose. The purpose of the Subscription Agreements was to make the investors who signed the agreements shareholders in the Funds pursuant to the terms of the Articles. A dispute between investors and the Funds regarding the redemption of shares, which is governed by the Articles, is "related to" the Subscription Agreements and falls within the scope of the forum-selection clause.

In *David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*, we considered the arbitration rules of the London Metal Exchange, which provided that "[a]ll disputes arising out of or in relation to any contract which contains an [arbitration clause] shall be referred to arbitration." 923 F.2d 245, 247 (2d Cir. 1991) (alteration omitted). The plaintiff and the defendant had entered into forward contracts for commodities trades, and those contracts contained arbitration clauses. The plaintiff "assert[ed] that its claims arise out of a collateral agreement with [the defendant], namely an agreement to value [the plaintiff's] forward contracts, and because the collateral agreement lacks an arbitration clause, the claims are not arbitrable." *Id.* at 251. We rejected that argument because "[t]he forward contracts were the

18

genesis of the parties' relationship; the alleged collateral agreement stemmed directly from the forward contracts," and "[t]he metals contracts between [the parties] represent the subject matter of the alleged valuation agreements." *Id.* at 251-52.

The same reasoning applies here. The Subscription Agreements were "the genesis of the parties' relationship," and while the Articles preceded the Subscription Agreements, the defendants' obligations under the Articles "stemmed directly" from the Subscription Agreements. The two documents obviously share a common "subject matter": the relationship between the defendants, as investors and shareholders, and the Funds. This relationship is sufficiently "clear and direct" for the liquidators' claims to "relat[e] to" the Subscription Agreements. *Pervel Indus.*, 871 F.2d at 8-9.

The alternative interpretation of the district court is that the Funds sold securities to investors all over the world under Subscription Agreements that would allow the investors to bring lawsuits related to the securities in any forum worldwide. That is commercially implausible. As the First Circuit has explained:

> forum selection clauses have varying purposes, but one reasonably inferred where, as here, a security is being offered to a range of customers is to concentrate all related litigation in a single forum. This assures the defendant that it will be able to litigate all of the actions in one place convenient to it; that one set of rules will apply; that consolidation may be readily available; that inconsistent outcomes can be minimized; and that a single lead precedent can control all cases.

*Huffington*, 637 F.3d at 22-23. The bankruptcy and district courts expressed skepticism of the liquidators' interpretation of the forum-selection clause on the ground that it would sweep almost any

19

litigation between the subscribers and the Funds into New York. As the liquidators note, "that is a feature of the clause, not a bug." Appellants' Br., No. 22-2101, at 49. The purpose of a forum-selection clause is to "ensure that parties will not be required to defend lawsuits in far-flung fora, and promote uniformity of result." *Martinez v. Bloomberg LP*, 740 F.3d 211, 219 (2d Cir. 2014) (quoting *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 722 (2d Cir. 2013)). In fact, "[t]he complexity of this decade-plus-long case illustrates the point." Appellants' Br., No. 22-2101, at 49.[3]

We conclude that the forum-selection clause established personal jurisdiction over all of the defendants.

## II

We turn to the merits of the liquidators' claims. The district court agreed with the decision of the bankruptcy court in *Fairfield III* that the safe harbor for securities transactions bars those claims the liquidators brought under BVI statutory law. The district court explained that § 561(d) overcame the presumption against extraterritorial application of American law and that, in any event, the application of the safe harbor to this case was domestic rather than foreign. The district court also agreed with the decision of the bankruptcy court in *Fairfield III* and *Fairfield IV* that the safe harbor does not bar those claims the liquidators brought under BVI common

---

[3] *See* Appellants' Br., No. 22-2101, at 49 ("Absent a clause concentrating cross-border litigation over billions of dollars in redemption payments in a single forum, the Liquidators would have to slog through expensive and time-consuming discovery and litigation against hundreds of individual Defendants at the threshold, just to establish personal jurisdiction. Contrary to the district court's belief, it makes perfect sense that the parties chose a broad forum selection clause to avoid just that outcome.").

law—namely, unjust enrichment, money had and received, mistaken payment, and constructive trust. Because the bankruptcy court decided in *Fairfield II* that BVI law barred all of the liquidators' common-law claims except for the constructive trust claims, *see Fairfield II*, 596 B.R. at 300-01, the net result of the district court's decision in *Fairfield V* was that the only claims remaining were the constructive trust claims against the defendants alleged to have known about the inflated NAV calculations.

On appeal, the liquidators argue that the safe harbor does not bar any of the claims. The defendants argue that the safe harbor bars all of the claims, including the constructive trust claims. We agree with the defendants. We first address the liquidators' argument that the defendants' position involves an extraterritorial application of the safe harbor in violation of the presumption against extraterritoriality. We then address the scope of the safe harbor.

## A

"It is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'" *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). "This principle finds expression in a canon of statutory construction known as the presumption against extraterritoriality: Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* "When a statute gives no clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010).

### 1

The Supreme Court has identified two reasons for the presumption against extraterritoriality. First and "[m]ost notably, it

21

serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries." *RJR Nabisco*, 579 U.S. at 335. "Although 'a risk of conflict between the American statute and a foreign law' is not a prerequisite for applying the presumption against extraterritoriality, where such a risk is evident, the need to enforce the presumption is at its apex." *Id.* at 348 (citation omitted) (quoting *Morrison*, 561 U.S. at 255). Second, the presumption "reflects the more prosaic 'commonsense notion that Congress generally legislates with domestic concerns in mind.'" *Id.* at 336 (quoting *Smith v. United States*, 507 U.S. 197, 204 n.5 (1993)). Because the "consistent application of the presumption 'preserves a stable background against which Congress can legislate with predictable effects,'" *Yegiazaryan v. Smagin*, 599 U.S. 533, 541 (2023) (alteration omitted) (quoting *Morrison*, 561 U.S. at 261), we "assume that Congress legislates against the backdrop of the presumption," *EEOC v. Arab Am. Oil Co.* (*Aramco*), 499 U.S. 244, 248 (1991).

The Court has prescribed a "two-step framework for analyzing extraterritoriality issues." *RJR Nabisco*, 579 U.S. at 337. "At the first step, we ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* If the statute contains such an "unmistakable" indication, "then claims alleging exclusively foreign conduct may proceed." *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 418 (2023). At this step, "possible interpretations," *Morrison*, 561 U.S. at 264, broad definitional language, *Abitron*, 600 U.S. at 420-21, and "generic terms like 'any' or 'every' do not rebut the presumption against extraterritoriality," *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 118 (2013). Still, "an express statement of extraterritoriality is not essential," *RJR Nabisco*, 579 U.S. at 340,

because "[a]ssuredly context can be consulted as well," *Morrison*, 561 U.S. at 265.

If the statute does not apply extraterritorially, then we proceed to the second step and ask "whether the case involves a domestic application of the statute." *RJR Nabisco*, 579 U.S. at 337. A court will answer that question "by looking to the statute's 'focus.'" *Id.* "The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413-14 (2018) (internal quotation marks and alterations omitted). "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *RJR Nabisco*, 579 U.S. at 337. But "if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.* In this way, "[s]tep two is designed to apply the presumption against extraterritoriality to claims that involve both domestic and foreign activity, separating the activity that matters from the activity that does not." *Abitron*, 600 U.S. at 419.

**2**

In this case, the district court held that "the presumption against extraterritoriality does not bar the application of § 546(e) to [the liquidators'] claims because (1) Congress has expressed a clear intent to apply § 546(e) extraterritorially through § 561(d), and (2) even if there were no such [c]ongressional intent, the application of § 546(e) here is a domestic one that passes step two of the test." *Fairfield V*, 630 F. Supp. 3d at 489-90. The district court was correct at step one, so we need not proceed to step two.

23

Section 546(e) does not, by its own terms, apply in a foreign proceeding under Chapter 15. *See* 11 U.S.C. § 546(e). If § 546(e) applies extraterritorially to the proceeding here, it must do so through § 561(d), which provides that any provision "relating to securities contracts" such as § 546(e) "shall apply in a case under chapter 15." *Id.* § 561(d). We therefore ask whether the language of § 561(d) "manifests an unmistakable congressional intent to apply extraterritorially." *RJR Nabisco*, 579 U.S. at 339. We conclude that it does. The only plausible reading of § 561(d) is that it applies extraterritorially.

Section 561(d) must apply extraterritorially if it is to have any effect at all. Through § 561(d), the safe harbor limits the foreign representative's avoidance powers. And the only avoidance powers a foreign representative has in a case under Chapter 15 are those that it possesses under foreign law. Chapter 15 expressly prohibits a foreign representative from using the statutory avoidance powers of the Bankruptcy Code. *See* 11 U.S.C. § 1521(a)(7) (authorizing the court in a Chapter 15 proceeding to grant a foreign representative "any additional relief that may be available to a trustee, except for relief under sections 522, 544, 545, 547, 548, 550, and 724(a)"). Nor can a foreign representative assert avoidance claims under state law: a bankruptcy trustee may assert such claims only pursuant to § 544(b), and § 1521(a)(7) denies the foreign representative access to relief under that section.[4] The district court correctly recognized that, if

---

[4] We elaborate further on § 544(b) in Part II.B.2. We note that at least one district court—while acknowledging that a foreign representative cannot use § 544(b) to assert state-law fraudulent conveyance claims—has held that such claims may proceed without relying on § 544(b) "if the basis of such relief is non-bankruptcy law and the foreign representative, under non-bankruptcy law, has standing to seek the relief." *In re Massa Falida do Banco Cruzeiro do Sul S.A.*, 567 B.R. 212, 222 (Bankr. S.D. Fla. 2017). We

24

§ 561(d) is to have any application, it must necessarily apply to avoidance claims under foreign law—that is, it must apply extraterritorially.

**3**

The liquidators' counterarguments are not convincing. First, the liquidators appeal to § 1523(a), which provides that "[u]pon recognition of a foreign proceeding, the foreign representative has standing in a case concerning the debtor pending under another chapter of this title to initiate actions under sections 522, 544, 545, 547, 548, 550, 553, and 724(a)." 11 U.S.C. § 1523(a). Based on this section, the liquidators assert that the "major premise" of the district court— that a foreign representative has no domestic avoidance powers in a Chapter 15 case—is "flat wrong." Appellants' Br., No. 22-2101, at 59. The liquidators argue that a case under Chapter 7 or 11 in which a foreign representative has intervened to initiate an avoidance action "would plainly be 'a case under chapter 15,' as Chapter 15 is what empowers a foreign liquidator to bring the avoidance action." Reply Br., No. 22-2101, at 20.

The text of § 1523(a) refutes this argument. It applies "in a case concerning the debtor pending *under another chapter* of this title." 11 U.S.C. § 1523(a) (emphasis added). If the case is "under another chapter," it cannot be "under chapter 15" for purposes of § 561(d). The foreign proceeding under Chapter 15 and the domestic proceeding

disagree. Section 1521(a)(7) allows a court in a Chapter 15 case to "grant[] any additional relief that may be available to a trustee" except for relief under the avoidance provisions of the Bankruptcy Code. 11 U.S.C. § 1521(a)(7). Relief under state fraudulent transfer laws is available to a trustee only via § 544(b). Accordingly, such relief would be available to a foreign representative only via § 544(b).

are separate cases; indeed, other sections of Chapter 15 speak of foreign and domestic proceedings concerning the same debtor "pending concurrently."[5] The liquidators' argument also conflicts with the text of § 561(d), which provides that the safe harbor "shall apply in a case under chapter 15 … to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11 of this title." 11 U.S.C. § 561(d). This language would not make sense if, as the liquidators contend, the safe harbor applies directly to a case under Chapter 7 or 11 in which a foreign representative has intervened.

The liquidators advert to § 1504, which states that "[a] case under [Chapter 15] is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515." *Id.* § 1504. The liquidators argue that this language shows that "[e]verything that follows that filing in the U.S. Courts is 'a case under Chapter 15,' even if the provisions of Chapter 15 empower foreign liquidators to use authorities under other chapters." Reply Br., No. 22-2101, at 20.

Not so. Section 1504 says that a Chapter 15 case begins when a foreign representative petitions for recognition of a foreign proceeding. And § 1523(a) says that once the foreign proceeding has been recognized, the foreign representative has standing to intervene in a case pending under another chapter and to avail himself of the avoidance powers under the Bankruptcy Code. But, as the text of § 1523(a) indicates, the foreign representative's intervention does not transform a case "pending under another chapter of this title" into a

---

[5] *See* 11 U.S.C. § 1501(b)(3) (stating that Chapter 15 applies when "a foreign proceeding and a case under this title with respect to the same debtor are pending concurrently"); *id.* § 1529 ("If a foreign proceeding and a case under another chapter of this title are pending concurrently regarding the same debtor, the court shall seek cooperation and coordination under sections 1525, 1526, and 1527.").

case "under Chapter 15." The Chapter 7 or 11 proceeding is a separate case from the Chapter 15 proceeding. Similarly, § 1528 provides that "[a]fter recognition of a foreign main proceeding, a case *under another chapter of this title* may be commenced only if the debtor has assets in the United States." 11 U.S.C. § 1528 (emphasis added). Such a case would be "under another chapter of this title," not "under Chapter 15," even though a Chapter 15 proceeding has been commenced pursuant to § 1504.

A case under Chapter 7 or 11 of the Bankruptcy Code is not a proceeding "under Chapter 15" simply because a foreign representative who has obtained recognition under Chapter 15 intervenes in the case. The Chapter 7 or 11 case, on the one hand, and the Chapter 15 case, on the other, are separate cases.

Second, the liquidators argue that § 561(d) need not apply extraterritorially to have effect because it "limit[s] the power of *domestic* trustees to avoid 'close-out' transactions, which is the focus of § 561 as a whole." Reply Br., No. 22-2101, at 22. Domestic trustees, however, cannot bring Chapter 15 cases.[6] Thus, a domestic trustee has no power to avoid "close-out" transactions—or any other transactions—in Chapter 15. *See* 11 U.S.C. § 1521(a) ("Upon recognition of a foreign proceeding … the court may, *at the request of the foreign representative*, grant any appropriate relief.") (emphasis

---

[6] *See* 11 U.S.C. § 1515(a) ("A *foreign representative* applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.") (emphasis added); *id.* § 1509(a) ("A *foreign representative* may commence a case under section 1504 by filing directly with the court a petition for recognition of a foreign proceeding under section 1515.") (emphasis added).

added).[7] Moreover, § 561(a) already provides that the exercise of close-out rights under securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements, and master netting agreements "shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by any order of a court or administrative agency *in any proceeding under this title*." 11 U.S.C. § 561(a) (emphasis added). Thus, Congress has separately provided that close-out transfers generally cannot be avoided "in any proceeding under this title"—including in Chapter 15—at least with respect to domestic applications.

Third, the liquidators argue that § 561(d) could apply when a foreign representative brings foreign law avoidance claims regarding *domestic* transactions. Appellants' Br., No. 22-2101, at 65. But the liquidators have not identified a case in which a *domestic* transaction was subject to avoidance in a *foreign* bankruptcy under *foreign* law. The liquidators suggest that "in *this very case*, Defendants insist that some of *their own transfers* are domestic transfers targeted by foreign-law avoidance claims." Reply Br., No. 22-2101, at 23. Yet if a court determined that the transfers at issue were domestic, it would likely decide that domestic law applied to the avoidance claims. Generally, "a bankruptcy court must apply the choice of law rules of the forum state," *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013), and "[t]he domestic nature of th[e] transfers … tips the scales … in favor of domestic adjudication," *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019); *see*

---

[7] The liquidators respond that "there is no bar to a domestic trustee participating in a proceeding initiated by a foreign representative under Chapter 15, and § 561(d) would make clear that a domestic trustee could not avoid close-out transfers in that proceeding." Reply Br., No. 22-2101, at 22. But the liquidators fail to cite any case in which a domestic trustee intervened in a Chapter 15 proceeding.

*also In re Bankr. Est. of Norske Skogindustrier ASA*, 629 B.R. 717, 736 (Bankr. S.D.N.Y. 2021) ("The Second Circuit recently suggested that the choice of law inquiry for avoidance actions should focus on the location of the debtor's transfer.").

**4**

Because § 561(d) must apply extraterritorially to serve a meaningful function, the liquidators fall back on the assertion that "the superfluity canon is no match for the substantive presumption against extraterritoriality." Reply Br., No. 22-2101, at 21. To be sure, we have avoided the suggestion that "the presumption against superfluity necessarily trumps, by itself, the presumption against extraterritoriality in every instance." *United States v. Epskamp*, 832 F.3d 154, 165 n.10 (2d Cir. 2016). But we "rely on the canon against superfluity" when doing so is "consistent with and reinforces our reading of the statute in other respects." *Id.* Here, the domestic interpretation would render the whole of § 561(d) superfluous, and there is an obvious alternative interpretation available. *See Yates v. United States*, 574 U.S. 528, 543 (2015) ("We resist a reading of [a statutory section] that would render superfluous an entire provision passed in proximity as part of the same Act."); *Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 602 (2d Cir. 2021) (rejecting an interpretation under which "the other subsections … would be swallowed up"). "[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

In addition to the text of § 561(d), the purpose of Chapter 15 indicates that § 561(d) applies extraterritorially. Section 561(d) applies "in a case under chapter 15," and "the main purpose of chapter 15 is to permit filing by *foreign, not domestic, debtors*." 1 Collier on

Bankruptcy ¶ 13.03 (16th ed.) (emphasis added). A transfer by a foreign debtor initiated in the foreign jurisdiction would likely be considered a foreign transfer for the purpose of the extraterritoriality analysis, even if the recipient is a domestic institution. [8] When Congress provided that § 561(d) applies "in a case under chapter 15," it did so with respect to the prototypical Chapter 15 case and the prototypical type of transfer that would be challenged in a Chapter 15 proceeding. Nothing in the text suggests that it applies to an exceptional or rare circumstance.

Moreover, "the context from which the statute arose" demonstrates that § 561(d) applies the safe harbor of § 546(e) extraterritorially. *Bond v. United States*, 572 U.S. 844, 866 (2014). [9] Congress enacted § 561(d) in response to the collapse of Long Term Capital Management L.P. ("LTCM"), a hedge fund based in the Cayman Islands:

> [The President's Working Group on Financial Markets] hypothesized the effect of a default on the LTCM Fund's counterparties. It noted that if the LTCM Fund was the

---

[8] We have held that when "the debtor is a domestic entity," and "the alleged fraud occurred when the debtor transferred property from U.S. bank accounts," the transfer at issue is a *domestic* transfer, regardless of the nationality of the recipient. *In re Picard*, 917 F.3d at 99 n.9. By parity of reasoning, a transfer by a foreign debtor from a foreign bank account would be a foreign transfer. In *Picard*, we expressed "no opinion on whether either factor standing alone"— the nationality of the debtor or the location of the bank account—"would support a finding that a transfer was domestic." *Id.*

[9] *See* Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967, 968 (2021) ("The mischief rule instructs an interpreter to consider the problem to which the statute was addressed, and also the way in which the statute is a remedy for that problem. … [T]he generating problem is taken as part of the context for reading the statute.") (footnote omitted).

subject of a Cayman Islands insolvency proceeding, "its Cayman receiver could have sought a Section 304 injunction prohibiting at least temporarily the liquidation of U.S. collateral pledged by LTCM to its counterparties." This might force U.S. secured creditors to seek the permission of the foreign bankruptcy court to liquidate their collateral, or at least delay them from liquidating any U.S. Treasury securities pledged by the Fund under a master netting agreement.

*Fairfield II*, 596 B.R. at 312-13 (citation omitted) (quoting President's Working Group, Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management (Apr. 1999)). "Congress and the Working Group were primarily and understandably concerned with U.S. creditors and U.S. markets" but "recognized that the financial contagion they feared did not stop at the border." *Id.* at 314. In fact, § 561(d) expressly provides that enforcement of financial contracts is "not to be limited based on the presence or absence of assets of the debtor in the United States." 11 U.S.C. § 561(d). Accordingly, "a chapter 15 foreign representative (and the bankruptcy court) cannot prevent the enforcement of Close-Out Rights, even if the exercise of those rights involves the transfer of collateral located abroad[,] and cannot invoke non-U.S. law to avoid and recover those transfers if they have already occurred." *Fairfield II*, 596 B.R. at 314.

The problem that Congress sought to address when it enacted § 561(d) required an extraterritorial application. We agree with the amicus that "[i]t cannot be that Congress, legislating in the wake of the LTCM collapse, intended to hobble investors by leaving them exposed to the risk of avoidance litigation brought by the bankruptcy

31

estates of failed foreign companies, especially when the Bankruptcy Code bars domestic trustees from bringing the exact [same] claims."[10]

As the district court recognized, the liquidators seek to "have it both ways—benefiting from the domestic forum Chapter 15 has created for foreign law claims as a matter of comity while trying to avoid the limitations that Chapter 15 imposes on their power to bring these claims." *Fairfield V*, 630 F. Supp. 3d at 490 (internal quotation marks and citation omitted). We have previously doubted that "[a]llowing a plaintiff's claim to go forward because the cause of action applies extraterritorially, while then applying the presumption [against extraterritoriality] to block a different provision setting out defenses to that claim," could be the result Congress intends "when it writes provisions limiting civil liability." *Force v. Facebook*, 934 F.3d 53, 73 (2d Cir. 2019). That result would "seem only to increase the possibility of international friction" and "could also give the plaintiffs an advantage when they sue over extraterritorial wrongdoing that they would not receive if the defendant's conduct occurred domestically." *Id.* It is similarly implausible that Congress intended to allow a foreign debtor and its representative to take advantage of U.S. bankruptcy law to bring avoidance actions unconstrained by the safe harbor that applies to the avoidance actions of a domestic trustee or debtor-in-possession.

**5**

We agree with the district court insofar as it held that § 561(d) applies § 546(e) extraterritorially. Because "a finding of extraterritoriality at step one will obviate step two's 'focus' inquiry,"

---

[10] Brief of the Securities Industry and Financial Markets Association as Amicus Curiae Supporting Appellees 14.

*RJR Nabisco*, 579 U.S. at 338 n.5, we need not identify the statutory focus or determine whether the conduct in this case occurred abroad.

**B**

Because the safe harbor of § 546(e) applies extraterritorially through § 561(d), we must decide whether the safe harbor bars the liquidators' claims. The parties agree that the transactions here are "settlement payment[s]" made to "financial institution[s] … in connection with a securities contract." 11 U.S.C. § 546(e). But the liquidators insist that this point is not conclusive. First, the liquidators argue that their statutory claims fall within the carve-out from the safe harbor for intentional fraudulent transfer claims. Second, the liquidators argue that because § 546(e) uses the term "avoid"—a term of art referring to the statutory avoidance powers conferred by the Bankruptcy Code—the safe harbor applies only to statutory avoidance claims under the Bankruptcy Code or under foreign law that exist solely in bankruptcy. That would mean the safe harbor does not apply to common-law claims under domestic or foreign law. To the extent that courts have applied the safe harbor to domestic common-law claims, according to the liquidators, those decisions have relied on an implied-preemption theory that does not apply to foreign law. Third, the liquidators argue that their constructive trust claims do not resemble traditional avoidance claims because the constructive trust claims depend on the defendants' knowledge and do not depend on the insolvency of the debtor.

The district court rejected the first argument on the ground that the liquidators' claims under BVI statutory law do not contain a fraud element and therefore do not resemble intentional fraudulent transfer claims under § 548(a)(1)(A). But the district court agreed with the liquidators that the safe harbor did not bar the BVI common-law

33

claims because "[t]here is nothing to suggest that Congress intended the Bankruptcy Code to preempt foreign common law claims." *Fairfield V*, 630 F. Supp. 3d at 494. And the bankruptcy court agreed with the liquidators that the constructive trust claims were not avoidance claims because the constructive trust claims "proceed on different theories and different proof" than the BVI avoidance claims. *Fairfield IV*, 2021 WL 771677, at *3.

We reject all three arguments. First, we agree with the liquidators that a foreign-law claim need not include fraud as an element in order to fall within the carve-out for intentional fraudulent transfer claims; it is sufficient if "the facts alleged in support of those claims include actual intent to hinder, delay, or defraud creditors." Appellants' Br., No. 22-2101, at 78. But we conclude that the liquidators do not allege such an intent here. Second, we conclude that § 546(e) applies to domestic common-law claims irrespective of implied-preemption principles. By virtue of § 561(d), the safe harbor applies in Chapter 15 "to the same extent as in a proceeding under chapter 7 or 11." 11 U.S.C. § 561(d). For that reason, foreign common-law avoidance claims fall within the scope of the safe harbor in cases under Chapter 15. Third, a common-law claim that seeks to avoid a covered transaction does not escape the safe harbor based on its legal theory or required proof. Because the constructive trust claims fall under the safe harbor and do not qualify for the carve-out for intentional fraudulent transfer claims, those claims are barred.

1

The safe harbor of § 546(e) contains a carve-out for avoidance claims brought under § 548(a)(1)(A). *Id.* § 546(e). Section 548(a)(1)(A), in turn, allows the trustee or debtor-in-possession to avoid transfers made and obligations incurred "with actual intent to hinder, delay, or

34

defraud" a creditor. *Id.* § 548(a)(1)(A). The liquidators argue that their claims "allege actual fraud and therefore fall within the exception to the safe harbor." Appellants' Br., No. 22-2101, at 75. According to the liquidators, the statutory claims rely on allegations that Citco acted with the actual intent to hinder, delay, or defraud creditors and that this intent is imputed to the Funds. We disagree.

First, the liquidators have not plausibly alleged that Citco actually intended to hinder, delay, or defraud creditors. The liquidators allege that—after becoming suspicious of BLMIS's operations and attempting three times to verify the existence of the Funds' assets at BLMIS between May 2000 and December 2002— "Citco never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008." App'x 4998. Additionally, "Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information." *Id.* at 5000. At the same time, "Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS." *Id.*

When credited, the liquidators' allegations might establish that Citco was negligent or reckless with respect to the risk of fraud at BLMIS but do not establish that Citco *intended* to hinder, delay, or defraud creditors. "[M]any courts look to the Restatement (Second) of Torts to refine the concept of intent under section 548." 5 Collier on Bankruptcy ¶ 548.04[a] (16th ed.). According to the Restatement, "[t]he word 'intent' is used … to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are *substantially certain* to result from it." Restatement (Second) of Torts § 8A (1965) (emphasis added). The Restatement explains:

35

> If the actor *knows that the consequences are certain, or substantially certain*, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness, as defined in § 500. As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence, as defined in § 282.

*Id.* § 8A cmt. b (emphasis added). It is true, as Judge Hand explained over a hundred years ago, that "in general, civil responsibility is imputed to a man for the usual results of his conduct, regardless of whether in the instance under consideration he actually had those consequences in mind." *In re Condon*, 198 F. 947, 950 (S.D.N.Y. 1912) (L. Hand, J.). But "in specific cases like this," in order to establish an "intent to hinder, delay, or defraud" creditors, "the law requires proof of that added element, his mental apprehension of those consequences, before it attaches to his conduct the result in question." *Id.* at 950-51. The allegations here do not show that Citco was "substantially certain" that BLMIS was a Ponzi scheme and that investors who redeemed shares late would be defrauded. At most, Citco was reckless in continuing to issue the NAV certificates despite its suspicions regarding BLMIS.

We have previously said that a presumption of intent would be appropriate "where a large entity, firm, institution, or corporation is acting in a manner that easily can be foreseen to result in harm." *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 221 (2d Cir. 2000). That case involved a claim of securities fraud against the accounting firm Ernst & Young, which allegedly had falsely certified that the financial statements of one of its auditing clients were prepared in

accordance with GAAP and that the client was in compliance with the financial covenants in its debt securities. We concluded that the investor-plaintiffs had established that Ernst & Young acted with the "intent to deceive, manipulate, or defraud" required to sustain a claim of securities fraud. *Id.* at 221. Ernst & Young had actual knowledge that the financial statements were inaccurate and that the client had defaulted on its debt securities, but it nonetheless certified to the contrary. *See id.* at 207-210. In this case, by contrast, Citco suspected— but did not know—that BLMIS was engaging in fraud. While that suspicion might establish recklessness or negligence, it does not establish that Citco intended to hinder, delay, or defraud investors. *See* Restatement (Second) of Torts § 8A cmt. b.

The Seventh Circuit has similarly stated that even when a transferor's "primary purpose may not have been to render the funds permanently unavailable to [creditors]," an actual intent for purposes of § 548(a)(1)(A) might still be present if the transferor "certainly should have seen this result as a natural consequence of its actions." *In re Sentinel Mgmt. Grp.*, 728 F.3d 660, 667 (7th Cir. 2013). We agree with those jurists who have explained that "*Sentinel* should not be read as replacing the traditional, more demanding standard for ascribing actual intent with a presumption that a person is aware of the natural consequences of her acts." *In re Lyondell Chem. Co.*, 554 B.R. 635, 651 (S.D.N.Y. 2016). While "proof of the natural consequences of one['s] acts may serve as circumstantial evidence that one appreciated those consequences," the fact-finder is nevertheless "required to find, based on all of the direct and circumstantial evidence, that the debtor did form an actual intent to defraud creditors, as that standard was described by Judge Hand or as intent is described in the Restatement (Second) of Torts." *Id.* at 651 n.17.

To establish an intent to hinder, delay, or defraud creditors, a plaintiff "must show that the debtor had an intent to interfere with creditors' normal collection processes or with other affiliated creditor rights for personal or malign ends." 5 Collier on Bankruptcy ¶ 548.04[a]; *see also In re Lyondell*, 554 B.R. at 650. The liquidators do not allege that Citco interfered with creditors' rights or collection processes. In fact, the liquidators' claims are based on Citco *facilitating* the redemption of the defendants' shares in the Funds. The non-redeeming investors, meanwhile, were not even creditors at the time the defendants redeemed the shares but were shareholders in the Funds. As the bankruptcy court recognized, a shareholder in the Funds became a creditor only after submitting a redemption request. *See Fairfield II*, 596 B.R. at 303 ("[T]he Defendants became creditors when they requested redemptions."). "A contract arose at the time that the [shareholders] served their notices of redemption. At that moment, they were entitled to be paid the NAV per share computed in accordance with Article 11(1) in exchange for their shares." *Id.* at 297. When Citco processed the defendants' redemption requests, the non-redeeming shareholders were not yet creditors of the Funds but shareholders with potential redemption rights.

Moreover, "[t]he requisite actual intent" for purposes of § 548(a)(1)(A) "must be something more than just an intent to prefer one creditor over another." 5 Collier on Bankruptcy ¶ 548.04[a]. Thus, "[m]ere intent to prefer one creditor over another, although incidentally hindering or delaying creditors, will not establish a fraudulent transfer under section 548(a)(1)." *In re Rubin Bros. Footwear, Inc.*, 119 B.R. 416, 423 (S.D.N.Y. 1990); *accord Richardson v. Germania Bank*, 263 F. 320, 325 (2d Cir. 1919) ("[A] very plain desire to prefer, and thereby incidentally to hinder creditors, is (1) not as a matter of law an intent obnoxious to [the prohibition on fraudulent transfers];

and (2) is not persuasive in point of fact that such intent … ever existed."). The liquidators' allegations establish at most that Citco preferred investors who redeemed shares early over those who allowed their investments to remain with the Funds. Even if Citco were substantially certain that its conduct would result in a preference for some creditors over others, it still would not have had the requisite intent to establish an intentional fraudulent transfer under § 548(a)(1)(A).[11]

Second, the liquidators have not plausibly alleged that Citco's intent—whatever it was—is attributable to the Funds. Section 548(a)(1)(A) requires that the *debtor* make the transfer with the actual intent to hinder, delay, or defraud creditors. The liquidators claim that "the Citco Administrator's fraudulent intent is attributable to the Funds, which authorized the transfers." Appellants' Br., No. 22-2101, at 75. We disagree.

---

[11] "Under the so-called Ponzi scheme presumption, the existence of a Ponzi scheme demonstrates actual intent as a matter of law because transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *In re BLMIS LLC*, 12 F.4th 171, 181 (2d Cir. 2021) (internal quotation marks and alteration omitted). While "most courts" apply some form of the Ponzi scheme presumption, 5 Collier on Bankruptcy ¶ 548.04[3][b], "[s]ome courts have rejected the Ponzi scheme presumption on the ground that it improperly treats preferences as fraudulent transfers," *In re BLMIS*, 12 F.4th at 201 (Menashi, J., concurring) (citing cases). We have "applied the Ponzi scheme presumption in prior cases when its application was uncontested." *Id.* at 202 n.7. In this case, neither party has argued that the presumption alters the analysis applicable to the transfers here. Accordingly, "[w]e need not and therefore do not address" the effect of the presumption. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 435 n.53 (2d Cir. 2004).

The liquidators have consistently maintained that the Funds were *victims* of a fraud that Citco perpetrated. The complaint alleges, for example, that "Citco issued the Certificates without good faith. The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates." App'x 4643. Under well-established principles, "notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person." Restatement (Third) of Agency § 5.04 (2006); *see Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985) ("[W]hen an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person, the presumption that knowledge held by the agent was disclosed to the principal fails because he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose."). If the allegations are correct, Citco's knowledge of the possible fraud at BLMIS would not be imputed to the Funds.

The New York Court of Appeals has emphasized that the adverse interest exception applies only in the "narrow circumstance where the corporation is actually the victim of a scheme undertaken by the agent to benefit himself or a third party personally, which is therefore entirely opposed (*i.e.*, 'adverse') to the corporation's own interests." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 467 (2010). It does not apply "[w]here the agent is perpetrating a fraud that will [also] benefit his principal." *Id.* The complaint does not allege that Citco's conduct benefited the Funds as well as Citco but that "[t]he Funds were the primary victims of Citco's conduct." App'x 4643. It is difficult to see how the Funds could have benefited by maintaining investments with BLMIS; the Funds would surely suffer losses when the scheme collapsed, and in the meantime the Funds did not receive

40

the personal benefits from the scheme that Madoff and (allegedly) Citco received.

The Privy Council's explanation of its decision in *Migani* indicates that BVI law would not impute Citco's bad faith to the Funds in this case. *See In re Lyondell*, 554 B.R. at 647 ("State law supplies the governing law principles for assessing the imputation of a corporate officer's intent to a corporation for purposes of § 548.") (citing *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 83 (1994)). The Privy Council stated that even if the issue of Citco's bad faith had been raised in *Migani*, the NAVs nonetheless would have been binding on the Funds because the alleged fraud was "external to the fund," and therefore "the redemption liabilities were determined by the directors in good faith, as the articles required." *Skandinaviska Enskilda Banken AB (Publ) v. Conway (as Joint Official Liquidators of Weavering Macro Fixed Income Fund Ltd.) (Weavering II)* [2019] UKPC 36 ¶ 24.[12]

---

[12] In *Weavering II*, which also involved a Ponzi scheme, the individual responsible for fraudulently inflating the NAVs, Magnus Peterson, was found to have "directly, and through his company WCUK, managed and controlled the Company for all purposes relevant to these proceedings." [2019] UKPC 36 ¶ 25. For that reason, the Privy Council decided that the fraud "cannot be considered external to the Company." *Id.* ¶ 24. The liquidators in *Weavering II*, who sought to recover redemption payments, argued that "Peterson's knowledge of the fraud would not be imputed to the company that he was defrauding." *Id.* ¶ 26. The Board explained that it was "not concerned here with attributing knowledge" but with the fact that Peterson, who had the authority to calculate and to certify the NAVs, did so "on a fraudulent basis." *Id.* The Board explained that while its prior decision in *Migani* did not consider the "operation of the fraud," in that case "the redemption liabilities were determined by the directors in good faith, as the articles required," and "[t]he fraud which operated on the assessment of the NAV was external to the fund." *Id.* ¶ 24.

We conclude that the liquidators' claims do not qualify for the carve-out for intentional fraudulent transfer claims under § 546(e). The allegations do not establish either that Citco acted with the actual intent to hinder, delay, or defraud creditors or that Citco's knowledge of the possible fraud at BLMIS is attributable to the Funds. Because the carve-out does not apply, the claims cannot proceed if the main clause of § 546(e) covers such claims.

**2**

The liquidators allege in the complaint that "[t]he Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of *avoidable transactions*, and generally represent assets of Sentry's estate that Defendants are not entitled to keep." App'x 4648 (emphasis added). The liquidators nevertheless argue on appeal that the constructive trust claims are not, in fact, "avoidance claims" within the meaning of the Bankruptcy Code.

In support of that conclusion, the liquidators contend that the safe harbor does not prohibit all "avoidance claims" but instead limits the trustee's ability to use the specific avoidance powers conferred by the Bankruptcy Code. Appellees' Br., No. 23-965, at 18. According to the liquidators, "[i]n this context, 'avoiding power' is a term of art that refers to the extraordinary statutory powers conferred on a trustee in domestic bankruptcy proceedings by §§ 544, 545, 547, and 548 of the Bankruptcy Code." *Id.* at 19. As a result, § 546(e) applies only to claims brought pursuant to the trustee's statutory avoidance powers under the Bankruptcy Code and does not apply to common-law claims that a litigant could bring outside of bankruptcy. *See id.* at 18. The liquidators conclude that § 561(d)—which provides that § 546(e) applies in Chapter 15 "to the same extent" as in Chapter 7 or 11—can apply only to claims brought under foreign statutory law that are

42

analogous to a bankruptcy trustee's statutory avoidance powers. *See id.* at 21.

The liquidators acknowledge that courts have held that § 546(e) bars state common-law claims, but in their view these courts have not held that § 546(e) directly covers such claims. Instead, according to the liquidators, these courts have held only that § 546(e) might *impliedly preempt* state common-law claims. *See id.* at 26. Because implied preemption applies only to conflicts between federal law and state law, the same bar would not apply in cases of conflict between federal law and foreign law. The liquidators maintain—and the district court agreed—that the rationale for applying the safe harbor to state common-law claims is inapplicable to foreign common-law claims, so the BVI constructive trust claims may proceed against the defendants alleged to have known that the NAV calculations were inflated.

We are not persuaded. The premise of the liquidators' argument—that the safe harbor applies only to the statutory avoidance powers conferred by the Bankruptcy Code—contradicts the statutory text. Section 546(e) does not say that it bars only avoidance actions that utilize the statutory avoidance powers. Rather, it says that "*[n]otwithstanding* sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid" the transfers the safe harbor describes. 11 U.S.C. § 546(e) (emphasis added). According to the liquidators, a statute that says "despite your specific power to avoid transfers, you shall not avoid these transfers" really means "you may avoid these transfers as long as you do not use your specific power to do so." That is not a natural reading of the text. Indeed, the Supreme Court has explained that "[a] 'notwithstanding' clause does not naturally give rise to … an inference" that one may do what the statute forbids using mechanisms other than those identified in the

43

"notwithstanding" clause. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017). Instead, the notwithstanding clause "just shows which of two or more provisions prevails in the event of a conflict." *Id.* Such a clause "simply shows that" the operative provision "overrides" the provisions identified in the notwithstanding clause, "and nothing more." *Id.* at 304. As a result, this sort of clause "confirms rather than constrains breadth." *Id.* at 302.

In this case, the notwithstanding clause of § 546(e) establishes that the safe harbor provision overrides §§ 544, 545, 547, 548(a)(1)(B), and 548(b). It does not imply that the operative language of the safe harbor, which provides that the trustee "may not avoid" a "settlement payment," limits only the use of the enumerated statutory avoidance powers. 11 U.S.C. § 546(e).

We also disagree with the liquidators' assertion that "avoiding powers" is a term of art referring only to the statutory avoidance powers under the Bankruptcy Code. We will recognize a term of art when a statute includes a word or phrase with a "specialized common law meaning." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 438 (2019). In this case, however, the liquidators argue that "avoid" has a *narrower* meaning than it would have had under the common law and that it does *not* encompass common-law claims that seek to avoid transfers. If Congress intended to restrict the ordinary meaning of "avoid" when it enacted the Bankruptcy Code, it would have provided a statutory definition identifying that technical sense. It did not. "Without a statutory definition," we rely on "the phrase's plain meaning at the time of enactment." *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020).

The liquidators recognize that courts have applied the safe harbor to bar state common-law claims in addition to claims that rely

on statutory avoidance powers. The liquidators argue, however, that these cases did not hold that the state common-law claims were "avoidance claims" within the meaning of the safe harbor but instead that the safe harbor impliedly preempted the state common-law claims. *Cf. Hillman v. Maretta*, 569 U.S. 483, 490 (2013) ("State law is pre-empted … when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'") (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). The liquidators conclude that "the implied-preemption doctrine has no application here" because that doctrine reflects "the unique relationship between federal law and state law under the Constitution" and does not apply to claims under foreign law. Appellees' Br., No. 23-965, at 32-33.

We do not agree that the application of § 546(e) to bar the trustee from avoiding covered transfers through state common-law claims depends on implied preemption. Rather, § 546(e) directly provides that the trustee "may not avoid" such transfers. 11 U.S.C. § 546(e). We have relied on implied preemption to answer a different question. Because § 546(e) provides that "the *trustee* may not avoid" those transfers, *id.* (emphasis added), the question of whether someone other than the trustee may avoid such transfers has arisen. In *In re Tribune Co. Fraudulent Conveyance Litig.*, we explained that "[s]ection 546(e)'s reference to limiting avoidance by a trustee provides appellants with a plain language argument that only a trustee *et al.*, and not creditors acting on their own behalf, are barred from bringing state law, constructive fraudulent avoidance claims." 946 F.3d 66, 81 (2d Cir. 2019).[13] Our phrasing of the issue assumed

---

[13] *See also In re Tribune Co. Fraudulent Conveyance Litig.*, 499 B.R. 310, 316 (S.D.N.Y. 2013) ("Section 546(e) addresses its prohibition on avoiding settlement payments only to the bankruptcy trustee …. Because Congress

that no "plain language argument" was available to suggest that the safe harbor allows *the trustee* to bring state-law avoidance claims. We relied on implied preemption to conclude that—while § 546(e) literally bars only the trustee from avoiding covered transfers—the safe harbor also bars other litigants from avoiding those transfers because of its preemptive effect. *See In re Tribune*, 946 F.3d at 94. That is how the decision has been understood. *See, e.g., In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 203 (S.D.N.Y. 2020) ("In *Tribune* … the Second Circuit held that § 546(e) impliedly preempts state law fraudulent conveyance claims by individual creditors that *would be barred by the safe harbor if brought by a bankruptcy trustee.*") (emphasis added).

We have subsequently applied *Tribune* to affirm the decision of a district court that "unjust enrichment claims" were "preempted by § 546(e) because they seek the same remedy as the Trustees' fraudulent conveyance claims, which it found were safe harbored under that provision." *In re Nine W. LBO Sec. Litig.*, 87 F.4th 130, 150 (2d Cir. 2023). We explained that this conclusion followed from "§ 546(e)'s plain language and legislative history," but the parties did not litigate whether the text or the congressional policy was dispositive. *Id.* Our precedent does not foreclose the straightforward conclusion that § 546(e) directly bars the trustee from avoiding a covered transfer through either a statutory or a common-law claim.[14]

---

has spoken so clearly with respect to the object of the limitation in Section 546(e), the Court discerns no basis in the text for barring [state-law constructive fraudulent conveyance] claims brought by Individual Creditors who have no relation to the bankruptcy trustee.").

[14] We are also not persuaded that whether § 546(e) bars state-law avoidance claims due to text or preemption is dispositive. Section 561(d) provides that the safe harbor of § 546(e) "shall apply in a case under chapter

The liquidators' contention that the safe harbor does not directly apply to common-law claims is wrong even based on their technical reading of the notwithstanding clause. The parties agree that the safe harbor applies to avoidance actions by a bankruptcy trustee pursuant to § 544, § 545, § 547, or § 548 of the Bankruptcy Code. One of these enumerated provisions—§ 544—expressly empowers the trustee to avoid transfers that could be avoided by an unsecured creditor under applicable state law, including state common law. Specifically, § 544(b)(1) provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b)(1).

In most cases, the trustee relies on § 544(b)(1) to assert claims under state fraudulent conveyance statutes.[15] But § 544(b)(1) "is not

_____

to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11 of this title." 11 U.S.C. § 561(d). If § 546(e) limits avoidance powers in domestic proceedings through text as well as implication, those limitations apply in a case under chapter 15 to the same extent. The statutory directive to apply the same limitations to foreign as to domestic proceedings precludes the argument that the reasoning by which § 546(e) limits certain avoidance powers applies only to the domestic context. Moreover, Congress has provided that "[n]othing in [Chapter 15] prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." *Id.* § 1506. To the extent that § 546(e) preempts state-law avoidance claims, it does so because extending the safe harbor in that way is necessary to "the accomplishment and execution of the full purposes and objectives of Congress." *Hillman*, 569 U.S. at 490 (quoting *Hines*, 312 U.S. at 67).

[15] *See* 5 Collier on Bankruptcy ¶ 544.06 ("The state laws most frequently used by trustees under section 544(b)(1) are the Uniform Fraudulent

47

limited to the avoidance of fraudulent transfers [under state statutes]. Rather, it gives a trustee statutory standing to avoid transfers on any grounds that could be asserted by … an unsecured prepetition creditor." *In re Park South Sec., LLC*, 326 B.R. 505, 514 (Bankr. S.D.N.Y. 2005). Thus, a trustee "could employ" § 544(b)(1) "to bring an unjust enrichment claim under state law." *Id.* To the extent that such a claim sought to avoid a transaction that falls within the scope of the safe harbor, however, it would be expressly barred by § 546(e) even under the liquidators' technical reading of that provision.

In fact, an avoidance claim on behalf of creditors based on a common-law theory such as unjust enrichment or constructive trust could be brought by the trustee *only* pursuant to § 544(b). "It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991); *see also Caplin v. Marine Midland Grace Tr. Co. of N.Y.*, 406 U.S. 416, 428 (1972).[16] Section 544(b) creates an exception to the general rule in *Wagoner*. "[W]hen acting under section 544(b), a trustee is vested with the rights of actual creditors to avoid certain transfers. So even if the trustee

Transfer Act ('UFTA') and its successor, the 2014 Uniform Voidable Transactions Act ('UVTA').").

[16] We expressed uncertainty in *Tribune* as to whether state-law fraudulent conveyance claims become the property of the debtor's estate when a bankruptcy proceeding commences. *See* 946 F.3d at 88. But we did not doubt that the trustee acquires the power to assert such a claim through § 544(b)(1), regardless of whether it is technically part of the debtor's estate. *See id.* (noting the "ambiguities as to exactly what is transferred to trustees *et al.* by Section 544(b)(1)"); *id.* at 89 (observing that "Section 544(b)(1) does not expressly state whether the bundle of rights transferred can revert" to creditors after a bankruptcy proceeding).

itself is otherwise barred from asserting the claim because of *Wagoner*, the trustee, standing in the shoes of the creditors, is not barred from asserting the claim." *In re Stanwich Fin. Servs. Corp.*, 488 B.R. 829, 834 (D. Conn. 2013). Unless he is proceeding under § 544(b), the bankruptcy trustee has no power to assert claims under state law on behalf of creditors. A constructive trust claim under state common law *must* be brought under § 544(b), but even the narrow reading of the safe harbor of § 546(e) would apply to such a claim.

The liquidators claim that "even assuming that the Safe Harbor applies extraterritorially through 11 U.S.C. § 561(d), the furthest the statutory limitation on statutory 'avoidance powers' could reach is foreign *statutory* avoidance powers that exist only in bankruptcy." Appellees' Br., No. 23-965, at 13 (citation omitted). But the focus of § 546(e) is the transaction, not the specific legal authority that a domestic trustee would use to avoid that transaction. *Cf. Merit Mgmt. Grp.*, 583 U.S. at 379 ("[T]he focus of the inquiry is the transfer that the trustee seeks to avoid."). It prohibits state statutory as well as common-law claims that seek to avoid covered transactions. We conclude that, through § 561(d), the safe harbor operates in Chapter 15 to prohibit claims under foreign statutory or common law that seek to avoid the same category of covered transactions. That includes the constructive trust claims in this case.

**3**

The liquidators attempt to rescue the constructive trust claims by arguing that the claims "'proceed on different theories and different proof' than avoidance claims under the Bankruptcy Code." Appellees' Br., No. 23-965, at 25 (quoting *Fairfield IV*, 2021 WL 771677, at *3). The liquidators explain that "insolvency is not an element of the Constructive Trust Claims, but obviously is an element of an

avoidance action under Chapter 5 of the Code (and a claim under the BVI Insolvency Act)." *Id.* at 24 (internal quotation marks and citation omitted). In addition, "whereas the Constructive Trust Claims require a showing of knowledge on the part of Defendants that the value of the assets they received was inflated, … knowledge is not an element of any of the avoidance actions created by Chapter 5." *Id.* at 24-25.

In general, a constructive trust claim does not require a showing of insolvency and does require bad faith on the part of the recipient of the property. *See, e.g., El Ajou v. Dollar Land Holdings plc* [1994] 2 All ER 685, 700 (identifying the elements of a constructive trust claim under BVI law). But it does not follow from these distinctions that the constructive trust claims are not avoidance claims. Whether a claim is an avoidance claim for purposes of the safe harbor depends on the remedy sought—that is, whether it would avoid a covered transaction—rather than the legal elements of the claim. "[I]t is the remedy sought, rather than the allegations pled, that determines whether § 546(e) preempts a state law claim," *In re Nine W.*, 482 F. Supp. 3d at 207, because "§ 546(e) 'was intended to protect from avoidance proceedings payments by and to commodities and securities firms in the settlement of securities transactions or the execution of securities contracts,'" *In re Nine W.*, 87 F.4th at 150 (quoting *In re Tribune*, 946 F.3d at 90). The liquidators concede that the constructive trust claims seek a "similar remedy" as an avoidance action using the Bankruptcy Code's avoidance powers. Appellees' Br., No. 23-965, at 25. That is dispositive.

In any event, we do not agree that the constructive trust claims proceed on a different theory than a traditional avoidance claim. Taking the liquidators' allegations as true, the defendants did not do anything that would have been wrongful if the Funds had not been insolvent. To the contrary, the defendants were contractually entitled

50

to redeem their shares at a price based on the NAV that Citco calculated. The liquidators recognize that "[t]he Articles provide shareholders with a contractual right to redeem their shares in exchange for their Redemption Payments at the NAVs determined by the Funds" and that "[t]he Liquidators' claim that Defendants are inequitably retaining funds in excess of the pro rata share purportedly owed to all shareholders … therefore relies on the Funds entering liquidation." *Id.* at 26. It misses the point to insist that constructive trust claims, unlike avoidance claims, require bad faith on the part of the transferee and do not require insolvency. While that may be true of constructive trust claims in general, it is not true of these constructive trust claims. The district court erred in allowing the claims to proceed.

## CONCLUSION

By adopting the "broad language" of the safe harbor provision, Congress sought to prevent "settled securities transactions" from being unwound in a way that "would seriously undermine … markets in which certainty, speed, finality, and stability are necessary to attract capital." *In re Tribune*, 946 F.3d at 90-92. "A lack of protection against the unwinding of securities transactions … would be akin to the effect of eliminating the limited liability of investors for the debts of a corporation: a reduction of capital available to American securities markets." *Id.* at 93. Contrary to arguments advanced on appeal, there is "no conflict between Section 546(e)'s language and its purpose." *Id.* at 92. That language operates here to bar claims seeking to avoid covered transactions. We reverse the judgment of the district court insofar as it allowed the constructive trust claims to proceed and otherwise affirm.